## Case No. 16,808.

### UTPADEL et al. v. FEARS.

[1 Spr. 559;[1] 21 Law Rep. 478.]

District Court, D. Massachusetts.   Oct., 1858.

#### GENERAL AVERAGE—FISHING VOYAGES.

The shares of fishermen, in mackerel voyages, who sail under the agreements usual in those voyages, are subject to contribution for general average.

[Cited in The Antelope, Case No. 484; The Cornelia M. Kingsland, 25 Fed. 859.]

This was a libel in personam, promoted by several of the crew of the fishing schooner, E. C. Haskell, of Gloucester, against the owner, to recover a balance alleged to be due them on settlement. This balance was withheld, by the owner, to pay the contribution which he claimed was due from them toward certain salvage and general average expenses, which were incurred on the voyage. The only question of law involved in the case was, whether the shares of the fishermen, under the contract in this case, were liable to these deductions. There was evidence offered of a usage in the mackerel business, to make and allow these deductions, but the opinion of the court, on the law, rendered it unnecessary to pass upon this evidence.

C. G. Thomas, for libelants.

R. H. Dana, Jr., for respondents.

SPRAGUE, District Judge. The crew, in this case, shipped under the usual articles of mackerel voyages. By these articles, the fish taken and brought home and delivered to the owner, are to be sold by him on joint account, and the proceeds of the sale are to be equally divided, one half to the owner, and one half to the master and crew. There are also, by established usage, certain deductions to be made for the expenses of coopering, packing and inspecting, and for bait. In the course of this voyage, and after all the fish had been taken, the vessel was overtaken by a storm, off Prince Edward's Island, and to prevent the vessel's dragging,

[1] [Reported by F. E. Parker. Esq., assisted by Charles Francis Adams, Jr., Esq., and here reprinted by permission.]

and being driven ashore, her masts were cut away. While she lay dismasted, she was taken in tow by another vessel, which carried her into Charlotte Town, Prince Edward's Island, and there libelled the vessel and cargo for salvage. This claim was settled by the owners, and the vessel released and taken home to Gloucester, and the fish sold in the usual manner. The general average for cutting away the masts was apportioned, according to the established principles of adjustment, on vessel and cargo, and the salvage expenses were apportioned in the same manner. In settling with the crew, the owner charges the whole fish with its contributory share of the salvage and general average expenses, according to the adjustment, and the half which belonged to the crew bore its half of this contribution. The crew contend that their shares, or lays, are, in fact, wages, and are, therefore, not liable to such contributions, but that it is the duty of the owner to bear all the expenses of sailing the vessel, including all expenses of general average and salvage, and that they are to have their clear half of the fish.

(The judge then examined the evidence on the subject of the cutting away the masts, and of the salvage, and decided that they were proper subjects of contribution, if the crew are bound to contribute, and that the adjustment was on correct principles.)

The salvors, in this case, had a lien on the fish, as well as on the vessel, and could, at their option, have proceeded by libel against both. If it had taken half of the fish to satisfy this lien, then only half of the fish caught could have been brought to port and delivered to the owner. Now, by the articles, it is not the fish caught, but the fish brought to port and delivered to the owner, out of which the payment to the crew is to be made. In such case, then, the crew could get only half of a half of the fish caught. If fish be lost by perils of the seas, it is a joint loss. Now, in this case, the owner paid the salvage, and thus relieved the fish from the lien. Instead of part of the cargo being thrown overboard to save the rest of the cargo and the vessel, the masts were voluntarily sacrificed to save vessel and cargo. On general principles, there can be no doubt that the crew, if to be treated as part owners of the cargo, should contribute to these expenses. And if, on the other hand, the fish had been taken by the salvor to satisfy his claim on fish and vessel, or if the fish had been voluntarily sacrificed to save the vessel and the rest of the fish, the crew would be entitled to a contribution from the owner, for his interest in the vessel and in the fish. This is the just, equitable and established principle governing joint interests, exposed to common perils of the seas. The fish in this case are brought home, in specie, but subject to certain expenses and liens. The crew are to be paid according to the value of the fish, as delivered by them to the own-

er. Its value is so much the less. It is as much the duty of the crew to bring the vessel and cargo back safely, as it is the duty of the owner to transport the fish safely in the vessel. The peril is a common misfortune, and the relief from it a joint charge. The case is the same, in principle, as if the salvors had been paid at Prince Edward's Island in fish specifically, for the contributory share chargeable on the fish.

It is argued, that the crew are in fact on wages, calculated on the fish brought in, and that whalemen and fishermen on lays, are always treated as serving on wages. Several instances have been cited from the books, where the shares or lays are said to be like wages, and in the nature of wages, and the crew are held not to be partners, or joint tenants with the owners in the oil or fish. Baxter v. Rodman, 3 Pick. 435; Bishop v. Shepherd, 23 Pick. 492. These cases go only to that extent. It has simply been found convenient to liken these shares to wages for certain purposes. In whaling voyages it has been held, that the amounts due the crew, when ascertained, are in the nature of wages. But this proposition gives us no aid. The question how the amount is to be ascertained still remains, and is the very question here. What deductions from the gross proceeds are to be made in ascertaining the amount due? And is general average contribution to be one of those deductions? If the money, when due, is to be treated as wages, still we must inquire, how much is due? But in some respects, the claims of the fishermen are not like wages. It is doubtful, if they have an action against the master, who is a joint shareowner with them. All the court can do is, in each case, and as to each question that arises, to determine whether the claims are, or are not, to be governed by the analogy of wages.

It is settled that seamen's wages are not liable to general average contribution. The only reasons I find assigned for this exemption are those given by Abbott and Kent. They are: 1st, because seamen might otherwise be unwilling to make jettison; and 2d, the hardship of diminishing their wages, without fault on their part, after all the perils, privations and labors they have undergone. Neither of these reasons is to me entirely satisfactory. The latter consideration has not prevented the enforcement of a forfeiture of all their wages, in case of a total loss of vessel and freight; and as to the former, it may with equal truth be said that if their wages are exempt from contribution, they may be too ready to shorten their labors, and seek relief too speedily from danger, by sacrificing the cargo, the property of others, which is under their charge. Another and better reason for the exemption is, that a seaman on wages does not stand on an equality of risk with those who have property in, or on board of the vessel. His wages are due to him by a contract for la-

bor and skill, and for which, upon the general principles of hiring, he should be equally entitled to compensation, whatever may be the result of the enterprise. But from reasons of policy, in this particular kind of hiring, the wages are lost, if there be a total loss of the vessel and cargo; but the encroachment upon the general principles of contract has gone no further. It is only in case of an actual total loss of vessel and freight, that the wages are lost. If all that is saved is equal in value only to the amount of the wages, still they must be paid in full; as it is often expressed, the wages are nailed to the last plank. Wherever, therefore, the danger is only of a partial loss, the wages are in no peril, and they ought not to contribute to a sacrifice made to avert or diminish a danger to which they were never exposed. Take a case like the present, where the only danger is of stranding, at a place where it is quite certain that parts, at least, of the vessel and cargo will be saved. Why should seamen on wages contribute to a sacrifice of the masts, made merely to diminish a partial loss, which was to be suffered by the owners of the vessel and the property on board? And such cases are very frequent; indeed, it is only in cases of partial loss that any question of contribution can arise, and in those it can rarely be shown that a seaman on wages had anything at risk, or derived any benefit from the sacrifice. As a general rule, therefore, upon the true and strict principles of average, a seaman on wages ought not to be called upon to contribute. But fishermen stand in a very different position. Their compensation is so bound up in the fish which they have taken, that a partial loss of the latter carries with it an equal loss of the former. If by a peril of the sea, one-half or three-fourths of the fish are destroyed, the men lose the same proportion of their compensation. If, in this case, the vessel had gone ashore, and a portion of the fish on board had thereby been destroyed, the libellants would have lost the same proportion of the fruit of their labor. They have the same interest, therefore, in diminishing a partial loss, which the owners of the vessel or of other cargo have, and thus stand on an equality of risk. Beside this, in case of jettison, those who are to select the articles to be sacrificed, should be in a position of impartiality, which would not be the case with fishermen, if they could neither claim nor be subjected to contribution. They would be strongly tempted to select any other article, and sacrifice every other species of property, rather than the fish which they had taken.

General average rests on two principles: First, a principle of equity, that all who are equally exposed to a common danger, shall contribute to indemnify one whose property is sacrificed for the common good; and second, a principle of policy, that those who

are to determine personally, or through agents, what property shall be selected for the sacrifice, shall be placed in positions of impartiality. Fishermen, in my opinion, come under this principle of equity, and should be governed by this rule of public policy. I am, therefore, of opinion that the shares of fishermen, under these contracts, are liable to general average, and are entitled to the benefits of general average. Libel dismissed.